

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-25-00037-CR

———————————————————

RUSSELL FINKELBERG, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 16th District Court
Denton County, Texas
Trial Court No. F22-1254-16

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

Appellant Russell Finkelberg appeals his conviction for aggravated assault with a deadly weapon, for which he was sentenced to ten years' imprisonment. In four issues, Finkelberg argues that the trial court erred by not suppressing evidence that was allegedly obtained in violation of the Fourth Amendment and the state exclusionary rule, that the trial court erred by not striking the complainant's testimony when his traumatic brain injury allegedly made him incompetent to testify, and that the due course of law clause provides a more substantive remedy for the State's destruction of evidence than the due process clause or the Michael Morton Act. After analyzing each of Finkelberg's four issues, we reach the following conclusions:

- Because the record demonstrates that the complained-of evidence was not obtained in violation of the Fourth Amendment, we conclude that the trial court did not err by denying Finkelberg's motion to suppress.

- Because Finkelberg's competency argument as to the complainant was not preserved or, alternatively, if his competency argument was preserved, because any discrepancies in the complainant's testimony go to credibility and weight, which are within the jury's sole province, we conclude that the trial court did not err by not striking the complainant's testimony.

- Because Finkelberg failed to distinguish in the trial court the rights and protections afforded under the Texas due course of law provision from those provided under the Fourteenth Amendment, he did not preserve his due course of law complaint.

Accordingly, we affirm.[1]

## II. Suppression Challenges

In his first and second issues, Finkelberg argues that the trial court erred by not suppressing evidence that was allegedly obtained in violation of the Fourth Amendment and the state exclusionary rule. Specifically, he contends that the seizure of his cell phone while he was detained but not under arrest, and the subsequent unauthorized protective sweep of his home, were the only bases for a search warrant leading to the evidence that he argues should have been suppressed. We set forth a summary of the record from the suppression hearing, the standard of review, and the applicable law before analyzing Finkelberg's suppression challenges and concluding that no Fourth Amendment violation occurred because the protective sweep of Finkelberg's home and the seizure of his cell phone were justified by officer-safety concerns or exigent circumstances.[2]

---

[1]Finkelberg does not contest the sufficiency of the evidence, so we omit a detailed background and instead summarize the evidence from the suppression hearing and the discussion of the complainant's mental status in the sections analyzing Finkelberg's challenges to the trial court's ruling on the motion to suppress and the complainant's testimony.

[2]Although Finkelberg's brief discusses a slew of warrantless exceptions (even those that do not apply), we address only those that are dispositive. *See* Tex. R. App. P. 47.1.

### A. What the Record Shows[3]

#### 1. The 911 Calls and the Officers' Response

On November 23, 2021, Judy Davidson—one of Finkelberg's neighbors—called 911 and said that there was a man outside of a house on Greystone Trail with a gun threatening to shoot somebody. She stated that she could see three males at the scene and that one was in a car. She told the 911 operator that one of the males had walked into the house, that the man who had been threatened had driven away, and that the man with the gun had then also gone into the house. After Davidson stated that the man with the gun had come back out of his house and had started toward her house, the 911 operator instructed her to take cover. Davidson later provided police with a written statement describing what she had seen, including that a man in a black shirt had drawn a gun out of his pants, had pointed it at the man in the car, and had threatened to shoot him.

Many officers from the Carrollton Police Department responded to the call. Officer Danny Stoner was the first to arrive on Greystone. While trying to find the exact location of the incident on the street, Officer Stoner received an update that the complainant was at a nearby McDonald's. Officer Olga Nozhechkina (Officer Noz)[4] and Officer Brion Vannucci reported to the McDonald's. Sergeant Heather Brun

---

[3]Finkelberg notes in his brief, "That testimony [from the motion-to-suppress hearing] was not re-litigated at trial." We therefore set forth only the testimony from the full-day suppression hearing, at which nine officers testified.

[4]This is how she is referred to in the record.

4

went first to the McDonald's and then to the Greystone location; Commander Zachary White went back and forth between the two locations; and Officers Michael Salazar, Rodney Stovall, and another officer joined Officer Stoner at the Greystone location.

The complainant told Officer Noz that he had gone to Finkelberg's house to confront him because he had been "overcharged for some services." The complainant stated that he had been assaulted by Finkelberg and that a firearm was involved. Finkelberg threatened to shoot the complainant if he put his car in reverse to leave. The complainant later gave a written statement that Finkelberg had punched him in the temple, had pulled a gun, and had put it to the complainant's head while saying that he was going to shoot him. Officer Noz found the complainant to be credible.[5]

Officer Stoner spoke to a neighbor named Stuart Bayley, who said that he had been present during the altercation. Bayley directed Officer Stoner to where the incident had occurred and outlined what had happened in the driveway, which was connected to the sidewalk and a public street. Bayley initially downplayed whether a gun was involved but ultimately wrote an affidavit stating that Finkelberg had thrown a punch at the complainant and had then pulled a gun (that looked like a black Glock)

---

[5]Commander White testified that when he spoke to the complainant at McDonald's, he did not find the complainant to be credible and believed he had "meth mouth"—a condition that occurs when a person's teeth are decayed and rotted as a result of smoking methamphetamine. After getting more information from other sources, Commander White found the complainant's testimony more credible.

and had pointed it at the complainant's head as they argued over money. Bayley's written statement corroborated what Davidson had said in her 911 call and in her written statement, as well as what the complainant had put in his written statement and what he had told Officer Noz at McDonald's.

Officers that arrived at the Greystone address could see from Finkelberg's front yard that he lived in a two-story duplex and that he had surveillance cameras mounted to the exterior.

### 2. The Investigative Detention

While officers at the scene were making a game plan with the information that they had obtained from both locations, Finkelberg exited his house and appeared in the front driveway. Because Finkelberg appeared to have an irrigation pipe in his hands, Officer Stoner put him in handcuffs and placed him on the curb in front of his house.[6] Officer Stoner said that Finkelberg was only detained at that point but that he read Finkelberg his *Miranda* rights because he was in handcuffs.

Finkelberg initially denied that there had been an altercation and that he had a gun; he also said that his surveillance cameras were fake. After the police confronted Finkelberg with information that had been relayed by other witnesses, he said that the complainant had tried to rob him but still said that there was no gun involved.

---

[6]Commander White described the handcuffing as placing Finkelberg "in custody" but said that there is not really a difference between "custody" and "investigative detention." Commander White explained that the police can detain people without putting them in handcuffs and that when handcuffs are placed on a person, that person is "in custody."

6

Finkelberg was wearing latex gloves, and when those were removed, his knuckles revealed bruising. Based on Commander White's training and experience, it appeared that Finkelberg had been in a fight.

### 3. The Protective Sweep

Shortly after Finkelberg was handcuffed and placed on the curb, officers performed a protective sweep of his house without Finkelberg's consent. Commander White decided to do the protective sweep of the house to make sure there were no other people with weapons who could come out and harm the officers. At that point, they had received multiple 911 calls[7] relaying information that multiple people and a firearm were involved in the altercation, that someone had fled into the house with a gun, and that someone had then left the house without a gun. Commander White agreed that he had no specific objective evidence indicating that someone was in the house, but the multiple callers had provided "very confusing information and not all of it was aligned to produce certainty." Commander White stated that a firearm's presence at a scene increases the danger and that the police's first priority is "to ensure that that firearm is still not actively in play" based on the concern for everyone's safety.

Similarly, when Officer Stoner was asked about the protective sweep, he explained that the police had "no idea who was inside the house"; all they knew was that there was a gun involved and that they had to protect themselves. Specifically,

_____

[7]The complainant also called 911.

because a weapon had been involved and was not found with Finkelberg, Officer Stoner said that "there would have been a weapon accessible to somebody." Officer Stoner highlighted that Davidson's 911 call had mentioned a third male who was present during the altercation, and Officer Stoner noted that they did not know where that individual had gone but heard that he had stayed on the scene after the complainant had left. Officer Stoner said that although he knew where Finkelberg, the complainant, and Bayley were prior to the protective sweep, he did not know if others had been involved and thought that there might have been more than three. Officer Stoner explained that in his law-enforcement experience, not everyone tells the truth; that the situation was still evolving at that time; and that the police had no idea how many people they were dealing with.

Officer Stovall also weighed in on the necessity for the protective sweep, saying, "[I]t was going to be a very dangerous situation if we didn't make sure there wasn't someone else in the residence." He explained that because Davidson's 911 call had mentioned multiple people, the police did not know if anyone else was in the house. Additionally, Finkelberg did not have a weapon when he exited his house, so there was a concern that someone else had access to the weapon that had been mentioned. Officer Stovall described the protective sweep as "an officer safety issue."

Commander White testified that he and three officers went into the house to perform the protective sweep. During the three minutes and fifteen seconds that they were inside the two-story townhome, they opened closet doors to look for people and

8

observed items that were in plain view but did not seize any items. An officer closed the front door once the sweep was completed, and no one reentered the home until a search warrant was obtained.

After the protective sweep concluded, Officer Salazar went to Finkelberg to watch over him while other officers continued the investigation. Finkelberg still had his cell phone at this point.

### 4. The Seizure of Finkelberg's Cell Phone

Sergeant Brun said that the decision to obtain a search warrant was based on the complainant's statements that Finkelberg had surveillance cameras,[8] as well as the fact that the police could see the cameras from the front yard. She took photos of Finkelberg's house so that she would "have something to pull back from" when she drafted the search-warrant affidavit.

While Sergeant Brun was taking photos of the house, Finkelberg was handcuffed and was sitting on the curb in an investigative detention. He tried to use his phone, and Officers Stoner and Salazar told him not to "mess with" it. Sergeant Brun explained that for officer-safety reasons, the police do not allow people who are detained to use their phones because they do not want more people showing up at the scene. After Finkelberg ignored their instructions and continued using his phone,

---

[8]The complainant mentioned that if the officers did not have Finkelberg in custody, then he was probably inside his home erasing camera footage.

9

Sergeant Brun took it from him.[9] She was not sure if Finkelberg had been placed under arrest by that time but said that it would not have surprised her if the body-cam video showed that he was under arrest.[10]

Sergeant Brun put Finkelberg's phone in her pocket and returned to taking photographs of the front of the home; she did not unlock the phone or go through it. As soon as she got close to the front door, the phone vibrated and made a "ding" sound that she knew from her training and experience to be a notification that the motion cameras had activated and that there would usually be footage stored with that. After reviewing the body-cam video, Sergeant Brun agreed that she had taken Finkelberg's phone out of her pocket and had said out loud "activated" and "motion detected" after looking at the phone's screen. She further agreed that the notification

---

[9]After Finkelberg's phone was taken, he said that he wanted to speak to his lawyer, and Officer Salazar told him that the officers would not ask him any more questions.

[10]According to the State's questioning, the body-cam video showed that Officer Noz had told Sergeant Brun to "10-95" (the radio code that means arrest) Finkelberg at 4:25 p.m. and that Sergeant Brun took Finkelberg's phone from him at 4:26 p.m. Officer Salazar agreed that the "10-95" was the arrest decision but that Finkelberg was not actually placed under arrest until he was told that he was under arrest. Officer Salazar said it was fair to say that although the best practice is for the police to tell a person when he is under arrest, it is not "actually legally required" for the police to do so. He concurred that an investigative detention can turn into an arrest quickly and that the police do not always have to say, "[N]ow you're under arrest." He further agreed that certain factors can indicate to a person that he is under arrest, such as being in handcuffs, being told not to use his cell phone, being told that he can make a call from jail, and being told by the police that officers will not ask any more questions. Officer Salazar agreed that if all of those things had happened prior to a person's cell phone being taken, a reasonable person would probably believe that he was under arrest.

from the motion cameras was conspicuous and had popped up on Finkelberg's cell phone on its own without any input from her. She testified that she did not unlock, search, or scroll through the cell phone's contents even after seeing the notification.

Sergeant Brun informed Commander White about the cameras' dinging, and he told her to place Finkelberg under arrest and have him removed from the scene.[11] Commander White directed her to go to the station and work on the search warrant.

### 5.     The Confusion over the Crime to Charge

In light of Finkelberg's argument that he was merely detained and not arrested when his cell phone was seized (and that no search-incident-to-arrest exception or inventory exception applied to that seizure), much of the hearing was spent on testimony that Officer Noz (who made the arrest decision) had initially told officers to arrest Finkelberg for a Class C assault, that she had changed the offense to a Class A assault causing bodily injury, and that Finkelberg was ultimately charged with aggravated assault with a deadly weapon.[12] Officer Stoner explained that part of the problem in deciding on the charge was that the complainant was at a separate location from where the altercation had occurred. Even though Officer Noz had said "Class C" when communicating the underlying offense, according to Officer Stoner, he and

---

[11]Officer Salazar transported Finkelberg to the Carrollton jail.

[12]Officer Noz explained that she had misspoken when she announced over the phone or over the radio to arrest Finkelberg for a Class C assault and a minute later said on her body-cam video that Finkelberg should be arrested for a Class A assault causing bodily injury; she had always meant that Finkelberg would be arrested for the felony of aggravated assault with a deadly weapon.

the officers at Finkelberg's location "all knew that there was an aggravated assault that [had] occurred, and that most likely that would be the charge." Based on what Officer Stoner had learned from Davidson, Bayley, and the complainant, as well as from everything that he had seen and heard during the investigation, he believed that there was probable cause to arrest Finkelberg for aggravated assault with a deadly weapon. Officer Stoner opined that Finkelberg had breached the peace when he was fighting the complainant with a firearm and that such conduct also constituted disorderly conduct.[13] Officer Noz agreed that a suspicious place can be the location where a crime was committed.[14]

Officer Stoner testified that at the time of Finkelberg's arrest at the Greystone location, all the officers involved had *not* sat down and shared all the information that they had collected from both locations; that did not occur until the officers convened

---

[13]Similarly, Commander White agreed (1) that a misdemeanor assault can become a breach of the peace if it takes place in public and disturbs the public order and that fighting in public and displaying a firearm in public in a manner that is calculated to alarm constitutes disorderly conduct. On redirect, he agreed that the same set of facts can give rise to probable cause to arrest for multiple offenses. Commander White testified that at the time of Finkelberg's arrest, there was probable cause to arrest him for breach of the peace and disorderly conduct and that after they got to the police station and learned what all the officers had to say, there actually had been probable cause to arrest for aggravated assault at the time when Officer Noz had made the arrest decision.

[14]*See* Tex. Code Crim. Proc. Ann. art. 14.03(a)(1) ("Any peace officer may arrest, without warrant . . . persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony[ or] breach of the peace . . . .").

12

at the station. The testifying officers agreed that charges can change as an investigation continues.

After witness statements were taken and Officer Noz had spoken with other officers at the station, she relied on the collective knowledge of the entire investigation in preparing an arrest warrant for aggravated assault with a deadly weapon. The record, however, does not provide an explanation regarding why an arrest warrant was obtained after the arrest was made.

### 6. The Search Warrant and the Search

While Officer Noz worked on the arrest warrant, Sergeant Brun and some detectives, including Detective Nathan Willingham, worked on the search warrant. After talking to all the officers, looking at the 911 calls and the witness statements, and reviewing her conversation with the complainant, Sergeant Brun believed that an aggravated assault with a deadly weapon had occurred, so she prepared a search warrant to that effect.[15]

---

[15]Sergeant Brun agreed that the search warrant did not state what Finkelberg had been arrested for, only that he had been placed under arrest and transported to the jail for processing. The search warrant affidavit, which was attached to the search warrant and admitted at the hearing, stated that "Finkelberg was found to have committed [a]ggravated [a]ssault with a [d]eadly [w]eapon. He was placed under arrest and transported to the Carrollton City Jail for processing." Finkelberg argued in the motion to suppress that this was a false statement. As explained above, Finkelberg was initially arrested based on Officer Noz's order to arrest for a "Class C," but this was a mistake on her part. As we detail in our analysis below, we assume that Finkelberg was merely detained at the time when his cell phone was seized, so his arguments about his arrest are not pertinent to our disposition.

13

The search warrant encompassed firearms and ammunition; surveillance cameras and their digital storage; digital-recording devices and related media; "currency [and] precious metals including gold"; and paperwork or other documents related to the sale or purchase of precious metals. Detective Willingham helped execute the search warrant, along with Detective Andrew Withers and a crime scene investigator.

Detective Willingham saw an AR-15 rifle in the downstairs living room above the couch and a handgun in front of the computer in the office. Because the warrant authorized the police to look for a handgun, they seized the handgun near the computer, as well as a loaded magazine. They looked in places that could have contained paperwork or currency and found things that looked "kind of suspect," but they did not seize them because they were outside the scope of the search warrant.

Detective Withers, who has training and experience in navigating computer programs to locate surveillance video, assisted with the digital requests that were outlined in the warrant. Detective Withers said that Finkelberg had a room where lots of different electronic components were set up. Among the items were two computers and a network video recorder (NVR), which Detective Withers said usually has an onboard drive. To Detective Withers, it looked like Finkelberg used his computer to access the data on the NVR. Detective Withers was able to access the surveillance video from November 23, 2021, through Finkelberg's computer. With a couple of breaks to tend to other things, it took Detective Withers approximately one

hour to find the relevant surveillance video that captured the assault. He said that although sometimes he extracts the video rather than seizing the whole system—because if it is powered off, it might require a password to re-access it—during this search, he made a copy of the video.

Detective Withers said that the police took the laptop that was in the living room because it had access to the NVR system and because he thought that it had some communications and network access. He extracted the random access memory (RAM) from the laptop before taking it out of the house because "once the laptop is powered off, that RAM is gone." He believed that the police had probable cause to seize the laptop because it was connected to the same network and had the DVR system on it as well. He agreed that a separate search warrant was later obtained to search the contents of the cell phone and the laptop.

### 7. The Items Sought to Be Suppressed

In his "Motion to Suppress Evidence[,] Motion to Suppress Search Warrant[, and] Motion to Quash Based on Illegal Arrest," Finkelberg requested the exclusion of the following seized evidence: one black Smith & Wesson pistol with magazine; a black pistol with magazine from the office; four twenty-dollar bills from the kitchen counter; a Samsung hard drive with a blue case retrieved from Roger Becker; a cell phone; an NVR surveillance system; a Lenovo Thinkpad; two hard drives - Force GT

15

red and Seagate black; a Pro Windows 8 computer; and a recording of his jail call.[16] Finkelberg argued that (1) the seizure of his cell phone was illegal because he had not been arrested at that time and, thus, no arrest-related exception authorized its seizure; (2) even if he had been arrested, it was not authorized under Article 14.03, so no arrest-related exception authorized its seizure; (3) Sergeant Brun's viewing of the security-camera notifications was not authorized by the plain-view exception; (4) the protective sweep was not authorized by the cell-phone notifications or any other reason; and (5) the search warrant was able to be obtained only because of the unauthorized cell-phone seizure and search and the unauthorized protective sweep.

## 8. The Trial Court's Ruling and Findings of Fact

After hearing testimony from the nine officers and reviewing the twenty-five exhibits that were admitted, the trial court denied Finkelberg's motion to suppress "in its entirety" and denied his motion to quash the indictment.[17] The trial court made

---

[16]Although Finkelberg lists all the items that were seized, he does not appear to argue about the money or the recording of his jail call but instead seems to focus his appellate argument on the "computers and recording equipment," noting that "[o]ne of the computers was connected to a network video recorder," as well as the firearm and surveillance video.

[17]Nine months after the suppression hearing, Finkelberg filed a "Motion to Suppress All Electronic Evidence Obtained from Computers and Electronic Storage Devices" and noted that four search warrants had been issued, including one for a cell phone. The trial court denied the motion. The State notes in its brief that no hearing was held on that motion and that Finkelberg has not raised issues based on that motion.

16

findings of fact, including the following that are relevant to the issues raised on appeal:

> 5. . . . . Officer [Noz] recalled that [the complainant] stated [that] Finkelberg had a camera (interpreted to be a surveillance camera)[ and] that he thought Finkelberg was still at the scene and guessed he was likely deleting the video footage.
>
> . . . .
>
> 9. Officers made contact with Finkelberg in the driveway when he exits[18] the townhome approximately twenty-one minutes after the first dispatch was received.
>
> 10. Finkelberg was detained in handcuffs for officer safety due to the nature of the call.
>
> 11. Officers ask Finkelberg for permission to enter the home. Finkelberg does not respond. Officer Stoner, when asking Finkelberg for consent, states the officers are going to check out the house and make sure no one else is in there. Within two minutes of Finkelberg[’s] exiting the townhome, officers perform a protective sweep of the townhome. This protective sweep lasts approximately three minutes and fifteen seconds[,] and officers only check places where an individual could be hiding. The officers conducting the sweep comment on a number of items (in plain view) and the fact [that] there was work being done in the bathroom. No evidence is seized during the protective sweep. Officers do not enter the townhome again until they have secured a warrant.
>
> . . . .
>
> 15. Finkelberg reaches for his cell phone off the ground next to him in an attempt to call his attorney. Finkelberg is told by officers that he cannot call his attorney right now and can make calls from the jail phone. [Sergeant] Heather Brun then seizes Finkelberg’s phone and

---

[18]Although the findings of fact would read more smoothly if they were written in past tense, we set them forth as they were made without altering the verb tenses.

places the phone in the pocket of her slacks. [Sergeant] Brun testified [that Finkelberg] was in investigative detention at this time.

16.     [Sergeant] Heather Brun walked to the front door of Finkelberg's townhome to photograph it for a search warrant[,] and Finkelberg's cell phone makes an audible noise. [Sergeant] Heather Brun takes the phone out of her pocket where she had placed it, looks at the phone's lock screen[,] and [sees] a notification that motion was detected at the front door. [Sergeant] Heather Brun did not manipulate the cell phone in any way to view the notification or affirmatively access the phone['s] content[s].

17.     [Sergeant] Heather Brun testified that she had knowledge that home[-]surveillance cameras are often linked to cell phones.

18.     Officer [Noz] relayed to the officers on scene at Greystone Trail to place Finkelberg under arrest for Class C Misdemeanor Assault.

19.     Finkelberg was arrested on scene without a warrant.

. . . .

22.     Officers subsequently met at the Carrollton Police Department and shared all the gathered information and ultimately decided to charge Finkelberg with the offense of [a]ggravated [a]ssault with a [d]eadly [w]eapon.

. . . .

25.     The [c]ourt finds the officers' testimony to be credible.

## B.     Standard of Review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). Because the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony, *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex.

18

Crim. App. 2007), we defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor, *Martinez*, 570 S.W.3d at 281. Whether the totality of circumstances supports reasonable suspicion or probable cause is a legal determination we review de novo. *State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008).

When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013). We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).

## C. Applicable Law

### 1. Fourth Amendment Law

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede*, 214 S.W.3d at 24. A defendant seeking to suppress evidence on Fourth Amendment grounds bears the initial burden to produce some evidence that the government conducted a warrantless search or seizure that he has standing to contest. *Rawlings v. Kentucky*, 448 U.S. 98, 104–05, 100 S. Ct. 2556, 2561 (1980); *State v. Martinez*, 569 S.W.3d 621, 623 (Tex.

19

Crim. App. 2019). Once the defendant does so, the burden shifts to the State to prove either that the search or seizure was conducted pursuant to a warrant or, if warrantless, was otherwise reasonable. *Martinez*, 569 S.W.3d at 623. If the State produces evidence of a warrant, the burden of proof shifts back to the defendant to show the warrant's invalidity. *Id.*

Whether a search is reasonable under the totality of the circumstances is a question that we review de novo. *Ornelas v. United States*, 517 U.S. 690, 696–99, 116 S. Ct. 1657, 1661–63 (1996); *Kothe v. State*, 152 S.W.3d 54, 62–63 (Tex. Crim. App. 2004). In the process, we must balance the public interest and the individual's right to be free from arbitrary detentions and intrusions. *Kothe*, 152 S.W.3d at 63. A warrantless search is per se unreasonable unless it falls within a recognized exception to the warrant requirement. *State v. Garcia*, 569 S.W.3d 142, 148 (Tex. Crim. App. 2018).

A protective sweep is an exception to the warrant requirement. *Reasor v. State*, 12 S.W.3d 813, 815–17 (Tex. Crim. App. 2000). The Eastland Court of Appeals has explained a protective sweep as

> a "quick and limited search of premises, incident to an arrest[19] and conducted to protect the safety of police officers or others." *Id.* at

---

[19]We include the footnote from the opinion showing that an arrest is not always a prerequisite to a lawful protective sweep:

> [*Maryland v.*] *Buie* involved an in-home arrest. 494 U.S. [325,] 327, 110 S. Ct. [1093, 1094 (1990)]. However, an arrest is not a necessary precondition to a lawful protective sweep. *United States v. Miller*, 430 F.3d 93, 100 (2d Cir. 2005). "[P]olice who have lawfully entered a residence possess the same right to conduct a protective sweep whether

20

815 . . . (quoting . . . *Buie*, 494 U.S. [at] 327, 110 S. Ct. [at 1094]). A protective sweep is permitted when the officer possesses a reasonable belief that the area to be swept harbors an individual posing a danger to those on the scene. *Buie*, 494 U.S. at 337, 110 S. Ct. [at 1094]; *Reasor*, 12 S.W.3d at 816.

*Watson*, 630 S.W.3d at 457.

Under the Fourth Amendment, a warrantless arrest is unreasonable per se unless it fits into one of a "few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S. Ct. 2130, 2135 (1993); *Torres v. State*, 182 S.W.3d 899, 901 (Tex. Crim. App. 2005). In Texas, a police officer may arrest an individual without a warrant only if probable cause exists with respect to that individual and the arrest falls within one of the exceptions set out in the code of criminal procedure. *Torres*, 182 S.W.3d at 901; *see* Tex. Code Crim. Proc. Ann. arts. 14.01–.03, 14.04.

To have probable cause for a warrantless arrest, an officer must reasonably believe, based on facts and circumstances within the officer's personal knowledge— whether through direct observation, from reasonably trustworthy information, or

---

an arrest warrant, a search warrant, or the existence of exigent circumstances prompts their entry." *United States v. Martins*, 413 F.3d 139, 150 (1st Cir. 2005)[, *abrogated in part on other grounds by Hill v. Walsh*, 884 F.3d 16 (1st Cir. 2018)]; *see Cooksey v. State*, 350 S.W.3d 177, 185 (Tex. App.—San Antonio 2011, no pet.) ("[A]rrest is not always, or *per se*, an indispensable element of an in-home protective sweep[.]" (quoting *United States v. Gould*, 364 F.3d 578, 584 (5th Cir. 2004) (en banc), [*abrogated in part on other grounds by Kentucky v. King*, 563 U.S. 452, 131 S. Ct. 1849 (2011)])).

*State v. Watson*, 630 S.W.3d 451, 457 n.2 (Tex. App.—Eastland 2021, no pet.).

both—that a person has committed or is committing an offense. *State v. Woodard*, 341 S.W.3d 404, 412 (Tex. Crim. App. 2011); *Torres*, 182 S.W.3d at 901–02. The officer must base probable cause on specific, articulable facts rather than the officer's mere opinion. *Torres*, 182 S.W.3d at 902. We use the "totality of the circumstances" test to determine whether probable cause existed for a warrantless arrest. *Id.*

A detention, as opposed to an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968); *Johnson*, 622 S.W.3d at 384. An officer conducts a lawful temporary detention when he reasonably suspects that an individual is violating the law. *See Johnson*, 622 S.W.3d at 384. Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Id.*

### 2. State Exclusionary Rule

In relevant part, the Texas exclusionary rule provides that

> [n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

Tex. Code Crim. Proc. Ann. art. 38.23(a). Application of Article 38.23(a) is generally unwarranted unless the defendant's privacy or property interest is illegally infringed in

the securing of evidence. *See Thomas v. State*, 586 S.W.3d 413, 419 (Tex. App.—

Houston [14th Dist.] 2017, pet. ref'd) (citing *Halili v. State*, 430 S.W.3d 549, 554–55

(Tex. App.—Houston [14th Dist.] 2014, no pet.)); *see also Wilson v. State*, 311 S.W.3d

452, 459 (Tex. Crim. App. 2010) ("Article 38.23 may not be invoked for statutory

violations unrelated to the purpose of the exclusionary rule or to the prevention of the

illegal procurement of evidence of crime.").

## D. No Fourth Amendment Violation

In his first issue, Finkelberg argues that the trial court erred by denying his

motion to suppress evidence that was allegedly obtained in violation of the Fourth

Amendment. Finkelberg focuses on the following facts:

> After the protective sweep, and while [Finkelberg] was still detained in handcuffs, Sgt. Brun seized [Finkelberg's] cell[ ]phone. She put [Finkelberg's] phone in her pocket.
>
> While taking photographs to assist with drafting the search warrant, [Finkelberg's] phone pinged while in Brun's pocket. The ping indicated [that] the cameras were real. She removed the phone from her pocket and looked at the screen. The on-screen notification indicated [that] the cameras were recording. [Record references omitted.]

Finkelberg challenges solely the seizure of his phone and the "unlawful" entry into his

home, arguing, among other things, that he did not consent to either and was not

under arrest and that a protective sweep was unnecessary and was not justified.[20]

Because, as explained below, the record demonstrates that both the protective sweep

---

[20]Other than noting that findings of fact were requested, Finkelberg does not specifically challenge in his brief any of the trial court's findings.

of Finkelberg's home and the seizure of his phone were justified by officer-safety concerns or exigent circumstances, we uphold the trial court's denial of Finkelberg's motion to suppress.

### 1. The Protective Sweep

We begin our analysis with the protective sweep. For purposes of his arguments, we agree with Finkelberg that he did not consent to having officers enter his home to perform a protective sweep and that he was not under arrest at the time that the officers performed the protective sweep of his home. *See Hernandez v. State*, No. 05-23-00565-CR, 2024 WL 3174273, at *5 (Tex. App.—Dallas June 26, 2024, no pet.) (mem. op., not designated for publication) (citing *Sheppard*, 271 S.W.3d at 291, and concluding that officer's handcuffing of defendant was a temporary detention, not an arrest, because it was done, in part, to enable officer to make a protective sweep of the scene). But neither his consent nor his arrest was a prerequisite to a protective sweep.

As noted above, a protective sweep is an exception to the warrant requirement and is permitted when an officer possesses a reasonable belief that the area to be swept harbors an individual posing a danger to those on the scene. *Watson*, 630 S.W.3d at 457. Here, the record is replete with officer testimony explaining that the police had received conflicting information and were not sure how many people were involved or where the weapon from the altercation was located. Although Davidson had relayed during her 911 call that three unnamed men were involved in the

24

altercation outside the home, the officers had no assurance that others were not inside Finkelberg's home. *See Beaver v. State*, 942 S.W.2d 626, 629–30 (Tex. App.—Tyler 1996, pet. ref'd) (holding that after the appellant was detained in the living room, a cursory sweep of non-adjoining rooms was justified when the officers saw unidentified persons going in and out of the mobile home and "did not know how many persons remained inside"). Bayley, Davidson, and the complainant had all mentioned that a weapon was involved in the altercation, and Finkelberg had no weapon on him when he exited his home. Officers Stoner and Stovall testified that a protective sweep was needed to ensure that there was no one with a weapon inside the house. Taken together, these facts justified the officers' protective sweep of Finkelberg's home.

Moreover, the protective sweep was quick, lasting barely more than three minutes for a two-story townhome, and was limited to looking in areas (such as closets) where a person might hide. Although the officers who performed the protective sweep noted items in plain view, no items were seized during the protective sweep.

Based on the responding officers' specific and articulable facts, viewed in the light most favorable to the trial court's ruling, we conclude (as the State did in its brief) that the officers had an objectively reasonable belief that there could have been another person inside Finkelberg's home who posed a danger to them and that the protective sweep while Finkelberg was detained was a reasonable course of conduct

25

under the Fourth Amendment. *See Sheppard*, 271 S.W.3d at 292 (holding that trial court erred by granting motion to suppress when the objective facts supported the legal conclusion that the deputy's actions in temporarily handcuffing appellee while making a quick inspection of the house was reasonable under the Fourth Amendment).

### 2. The Cell Phone's Seizure

For purposes of our analysis of the cell-phone seizure, we assume without deciding that Finkelberg was merely detained—not under arrest—when Sergeant Brun seized his phone.[21] Here, the trial court's findings of fact are silent regarding why Sergeant Brun decided to seize Finkelberg's cell phone. But the trial court explicitly found that the officers' testimony was credible, and Sergeant Brun testified that for officer-safety reasons, the police do not allow people who are detained to use their phones because they do not want more people showing up at the scene. Viewing the evidence in the light most favorable to the trial court's denial of the suppression motion, we infer that the trial court believed Sergeant Brun's testimony regarding the necessity of seizing Finkelberg's phone due to officer-safety concerns. *See generally State v. Sandifer*, No. 02-15-00307-CR, 2016 WL 7157249, at *4 (Tex. App.—Fort Worth Dec. 8, 2016, pet. ref'd) (mem. op., not designated for publication) (stating that "we will infer the necessary fact findings that would support the ruling if

---

[21]Additionally, it is worth noting that a warrant is required only to search a phone—not merely to seize it. *See Ordonez v. Gonzalez*, No. EP-23-CV-99, 2024 WL 1250181, at *13 (W.D. Tex. Mar. 25, 2024) (order).

the evidence, viewed in the light most favorable to the ruling, supports those findings"); *Flores v. State*, 177 S.W.3d 8, 16 n.9 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (stating that "[t]he trial court's findings of fact were silent on whether a motion sensor was on the porch of the house, but we must assume the court made implicit findings that support its ruling, provided those implied findings are supported by the record" (citing *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002)).

Additionally, as noted in the trial court's findings, the complainant had told officers that it was likely that Finkelberg would delete footage recorded by his surveillance cameras. And contrary to Finkelberg's statement to the officers that the cameras were "dummy cameras," the officers could see that they were wired and had lights on. Although Finkelberg contends on appeal that he was handcuffed and unable to destroy evidence, the trial court was entitled to disbelieve his statements and to conclude that he was not credible, especially since he initially told the officers that there was no altercation and that there was no gun. As noted above, officers saw Finkelberg manipulating his phone, and he claimed that he was trying to call an attorney. Sergeant Brun was thus permitted to seize Finkelberg's cell phone on the reasonable belief that evidence would be imminently destroyed if the police waited to obtain a warrant before seizing the phone. *See State v. McGuire*, 689 S.W.3d 596, 605 (Tex. Crim. App.) (plurality op.) (stating that "[e]xigent circumstances are circumstances that 'call for immediate action or detention by police'" and noting that one of the factors to be considered is "whether evidence of criminality is likely to be

27

destroyed, degraded, or lost"), *cert. denied*, 145 S. Ct. 443 (2024); *Igboji v. State*, 666 S.W.3d 607, 616–17 (Tex. Crim. App. 2023) ("For exigent circumstances to justify a warrantless seizure of personal property, such as a cell phone, the record must show that law enforcement officers reasonably believed that evidence would be imminently destroyed if they waited to obtain a warrant to seize the property."); *Rafiq v. State*, 661 S.W.3d 827, 839 (Tex. App.—Beaumont 2022, pet. ref'd) (stating that police with reasonable suspicion may seize a container—such as a cell phone—and hold it so that it may be preserved while police seek to obtain a search warrant when "the exigencies of the circumstances demand it" (quoting *United States v. Place*, 462 U.S. 696, 701, 103 S. Ct. 2637, 2641 (1983))); *see also Riley v. California*, 573 U.S. 373, 388, 134 S. Ct. 2473, 2486 (2014) (noting that it was sensible for appellants to concede that officers could have seized and secured their cell phones to prevent destruction of evidence while seeking a warrant).

Viewing the evidence in the light most favorable to the trial court's findings, the suppression-hearing evidence established that Sergeant Brun's warrantless seizure of Finkelberg's cell phone was permissible based on officer-safety concerns or exigent circumstances.

### 3. The Alleged Cell Phone "Search"

In his second issue, Finkelberg argues that the trial court erred by not suppressing evidence that was allegedly obtained in violation of the state exclusionary rule. Specifically, Finkelberg contends that the trial court erred by denying the motion

28

to suppress evidence from the surveillance-camera videos that was allegedly "obtained from [his] cellular phone." Because Finkelberg's argument relies on unsubstantiated bases—that his cell phone was searched and that without his cell phone, officers would not have been notified of the working surveillance cameras—it fails.

Courts, including this one, have held that police may legally open a cell phone's battery pack to view its serial number without violating the Fourth Amendment. *See Martinez v. State*, 689 S.W.3d 30, 46 (Tex. App.—Fort Worth 2024, pet. ref'd). The officer's actions in this case were less intrusive than those held to be permissible in *Martinez*. Viewing a contemporaneous notification on a cell phone does not require the removal of any portion of the phone, and thus law enforcement's viewing a text message or an incoming call contemporaneously with its appearing on the outward screen would not constitute a search because the information, at that moment, is in plain view. *See* Kristen M. Jacobsen, *Let's Get Physical: Answering What Constitutes a Search of a Cell Phone After* Riley *Through a "Use-Based" Approach*, 53 No. 4 Crim. L. Bull. ART 3 (Summer 2017); *see also Black v. State*, 358 S.W.3d 823, 828 (Tex. App.—Fort Worth 2012, pet. ref'd) ("We hold that merely viewing the screensaver did not constitute a search."); Daniel Zamani, *There's an Amendment for That: A Comprehensive Application of Fourth Amendment Jurisprudence to Smart Phones*, 38 Hastings Const. L.Q. 169, 198 (2010) (stating that the scope of a warrantless search should be confined to the presently exposed screen on the phone).

The record demonstrates that Sergeant Brun did not perform a search on Finkelberg's phone. She heard the dinging and felt it vibrate, took it out of her pocket, and saw the notification from the surveillance cameras on the home screen. She did not input a password in order to view the notification; it was in plain view. Moreover, to the extent that Finkelberg argues that without his cell phone, officers would not have been notified of the working surveillance cameras, he ignores that all of the officers who responded to his residence could see the cameras—as well as their wiring and the illuminated red lights showing that they were recording—because they were in plain view on the exterior of his house. The cell phone notification only provided further confirmation that the cameras were indeed recording. And the officers did not seize the videos from the surveillance cameras or search the contents of Finkelberg's cell phone until after securing the necessary search warrants.

Thus, Sergeant Brun's viewing of the notifications on the cell phone screen was permissible under the Fourth Amendment.

### 4. Disposition of First and Second Issues

Because the police could have performed the protective sweep and seized Finkelberg's phone regardless of whether he was arrested and because the viewing of the notifications was not a search, we hold that there was no abuse of discretion in denying the motion to suppress. Having addressed Finkelberg's Fourth Amendment arguments and ruled against him, we overrule his first and second issues.

30

### III. Forfeited Challenge to the Complainant's Testimony

In his third issue, Finkelberg argues that the trial court abused its discretion by not striking the complainant's testimony because he was "no longer competent after a traumatic brain injury left him physically disabled." Finkelberg relies on Texas Rule of Evidence 601(a)(1), contending that the complainant was incompetent to testify because he was "in an insane condition of mind at the time when [he was] offered as a witness." Finkelberg did not preserve this argument because his competency argument on appeal does not match the no-independent-knowledge objection that he made in his mid-trial motion to strike the complainant's testimony. Alternatively, even if his competency argument was preserved, the trial court's implicit determination—that the complainant was competent to testify—was not an abuse of discretion because any discrepancies in the complainant's testimony went to credibility and weight, which are within the jury's sole province.

#### A. The Law on Preservation and Competency

The complaint made on appeal must comport with the complaint made in the trial court, or the error is forfeited. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009) ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial."). To

determine whether the complaint on appeal conforms to that made at trial, we consider the context in which the complaint was made and the parties' shared understanding at that time. *Clark*, 365 S.W.3d at 339; *Resendez v. State*, 306 S.W.3d 308, 313 (Tex. Crim. App. 2009); *Pena*, 285 S.W.3d at 464.

Rule 601(a)(1) provides that a witness is incompetent to testify if he is "insane" at the time of trial or if he "was insane at the time of the events about which [he] is called to testify." Tex. R. Evid. 601(a)(1). As a general rule, a witness is presumed to be competent to testify. Tex. R. Evid. 601; *Dufrene v. State*, 853 S.W.2d 86, 88 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd). A witness's competency is generally a question for the trial court, and absent an abuse of discretion, its ruling will not be disturbed on appeal. *Minor v. State*, 659 S.W.2d 161, 163 (Tex. App.—Fort Worth 1983, no pet.); *see also Montoya v. State*, 291 S.W.3d 420, 426 (Tex. Crim. App. 2009), *superseded on other grounds by statute in Turner v. State*, 422 S.W.3d 676, 692 & n.31 (Tex. Crim. App. 2013). For example, "[t]he fact that a witness has a history of mental illness does not automatically make him incompetent to testify . . . and . . . may be a proper subject of cross-examination to the extent it impacts his credibility." *Brooks v. State*, 590 S.W.3d 35, 48 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd); *see also Hogan v. State*, 440 S.W.3d 211, 217 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (holding that intellectually disabled woman's mental status did not automatically render her incompetent to testify and that her mental status affected her credibility and the weight of her testimony). The law is well-settled that the credibility of the

witness and the weight to be given a witness's testimony are matters for the jury to decide. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). To the extent a witness's mental impairment may impact credibility, the jury is entitled to hear evidence as to the mental status of the witness and the extent of his mental impairment. *See Griffin v. State*, No. 14-23-00833-CR, 2025 WL 1338101, at *6 (Tex. App.—Houston [14th Dist.] May 8, 2025, no pet.) (mem. op., not designated for publication).

## B. What the Record Shows

Unrelated to the incident with Finkelberg, the complainant was involved in a major car wreck approximately six months prior to the trial and suffered a traumatic brain injury, which caused him to have trouble remembering events from before the accident. The complainant testified that his father was Finkelberg's mail carrier, but the complainant did not know when he and Finkelberg had met or why he had come to know one of his father's mail clients. The complainant recalled having asked Finkelberg for advice on "different things" and had talked to him about coins but could not remember if Finkelberg had helped him get involved with collecting rare coins or making money through coin collecting. The complainant was able to identify Finkelberg in the courtroom.

In preparation for his trial testimony, the complainant watched the videos from the police-officer body cameras and his interview with Detective Duncan and reviewed his 2021 written statement. The complainant did not remember driving to

33

Finkelberg's house on November 23, 2021. The complainant said that he had journal entries from that time but had no recollection of the police statement. The complainant had no recollection of calling 911, but he was able to see from his police statement that he had called 911. At that point in the State's questioning, defense counsel asked to take the complainant on voir dire.

During voir dire, defense counsel asked whether reading his police statement caused him to remember the events. The complainant responded that his police statement helped him "know that [he] did it," but he did not "remember doing it." At the bench, defense counsel argued that the police statement was not refreshing the complainant's recollection and that he was not testifying from personal knowledge; the trial court stated that it understood that; and defense counsel "object[ed] to his testimony." The trial court ruled that defense counsel would need to object on a question-by-question basis. After that, defense counsel made only (1) a nonresponsive objection that was sustained after the complainant failed to answer a yes-or-no question with either of those options and (2) a leading objection that was overruled. When defense counsel cross-examined the complainant, he highlighted his lack of memory of the events at issue.

Afterwards, the State rested, and defense counsel moved for an instructed verdict. After the trial court denied the motion, defense counsel requested that the complainant's entire testimony "be stricken from the record because he has *no independent knowledge* of anything that happened." [Emphasis added.] The trial court

34

denied the request to strike the complainant's testimony and found "that those issues with credibility of [a witness are] within the province of the jury to determine whether they want to believe all, any, or none of a witness's testimony" and allowed the complainant's testimony "to stand as it is."

## C. Analysis

Even if we assume (without deciding) that Finkelberg's motion to strike the complainant's testimony was timely, he did not preserve the competency complaint that he makes on appeal. As detailed above, the record demonstrates that Finkelberg's motion to strike was based on the complainant's lack of personal knowledge of the November 23, 2021 incident. *See generally* Tex. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). At no point did Finkelberg argue to the trial court that the complainant was insane or was not competent to testify. *See generally* Tex. R. Evid. 601(a)(1). Nor did Finkelberg request a hearing on the complainant's competency to testify. *See McGinn v. State*, 961 S.W.2d 161, 165–66 (Tex. Crim. App. 1998) (holding that defendant waived any objection regarding a child's incompetence to testify at trial by not requesting a hearing on competency to testify).

The situation that we are presented with is similar to that in a case from the Dallas Court of Appeals:

35

[A]ppellant contends we should disregard [the lead prosecutor's] testimony because "she did not have the capacity of recollection and narration and thus was not competent to testify on the critical issues before the [c]ourt."

The record does not show [that] appellant asserted this "competency" complaint in the trial court. *Clark* . . . , 365 S.W.3d [at] 339 . . . (citing Tex. R. App. P. 33.1(a)(1)(A); *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986) (point of error on appeal must comport with objection made at trial)). Therefore, that complaint presents nothing for this [c]ourt's review. *See id.*; *Baldit v. State*, 522 S.W.3d 753, 762 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (competence of witness is generally waived when witness is permitted to testify without objection). Even so, [the lead prosecutor] was plainly competent to testify. Any defects in her memory or notes go only to the weight a fact[]finder should give her testimony.

*Ghanbari v. State*, No. 05-17-00257-CR, 2019 WL 1649455, at *10 (Tex. App.—Dallas Apr. 17, 2019, pet. ref'd) (mem. op., not designated for publication).

We similarly conclude that Finkelberg's appellate complaint challenging the complainant's competency does not comport with the no-personal-knowledge complaint that he raised in the trial court. *See Clark*, 365 S.W.3d at 339; *Lovill*, 319 S.W.3d at 691–92; *Pena*, 285 S.W.3d at 464; *Ghanbari*, 2019 WL 1649455, at *10. He thus has presented nothing for our review.

Even if Finkelberg's Rule 601 complaint had been preserved for our review, we would overrule it. The record does not contain evidence that the complainant was insane at the time of trial. Although the complainant's traumatic brain injury limited his ability to recall the details of the incident in November 2021 when Finkelberg put a gun to his head, when a video labeled as State's Exhibit 3 was played, the complainant

recognized himself, his father's car (that he had been driving at that time), and Finkelberg's driveway, and the complainant testified that he knew that Finkelberg had surveillance cameras. Any inconsistencies or inability to recall certain facts did not render the complainant incompetent to testify but went to his credibility—an issue for the jury. We therefore cannot say that the trial court abused its discretion by implicitly finding the complainant competent to testify. *See Robinson v. State*, 368 S.W.3d 588, 604 (Tex. App.—Austin 2012, pet. ref'd) (upholding trial court's overruling of competency objection and motion to strike neighbor's testimony even though witness could not remember speaking with the investigators on the day of the shooting and admitted that she "wasn't really paying attention" to the cars in the victim's driveway).

We overrule Finkelberg's third issue.

## IV. Unpreserved Due Course of Law Argument

In his fourth issue, Finkelberg argues that the Texas Constitution's due course of law clause provides a more substantive remedy for the State's destruction of material evidence—recordings of the complainant's 911 call[22]—than the due process clause. Based on the missing recording, Appellant filed a "Motion to Dismiss Due to Failure of the State to Timely Disclose Evidence, Destruction of Evidence[,] and

---

[22]The record shows that when an investigator with the Denton County District Attorney's Office requested the recording of the complainant's 911 call from November 2021, the Carrollton Police Department responded that its "911 Audio retention time is only 1 year" and that it did not have "any other prior calls for this case." Although the investigator's request is dated January 5, 2022, it appears that is a typographical error because the responses are from January 2023.

Due[-]Process Violations," seeking dismissal of all the charges against him. In that

motion, Finkelberg argued that

> [d]ue to the State's failure to disclose material evidence, [Finkelberg's] due process and **due course of law** rights under both the United States and Texas Constitutions have been violated. Remedies for destruction of evidence include dismissal, *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993), or, in less egregious cases, the suppression by [the] prosecution of evidence favorable [sic] to the defendant upon request, *Brady v. Maryland*, 373 U.S. 83[, 83 S. Ct. 1194] (1963). In . . . Finkelberg's case, the only adequate remedy for said due process and **due course of law** violations is dismissal of the instant case with prejudice because the taint to [Finkelberg] cannot be neutralized by any other means. *Illinois v. Fisher*, 540 U.S. 544[, 124 S. Ct. 1200] (2004). . . .
>
> . . . .
>
> When the State violates a citizen's right to due process, as the State of Texas has done in this case, the appropriate remedy is dismissal [of] all of the charges against [Finkelberg]. This is sought by [Finkelberg] as a remedy for violation[s] of the Michael Morton Act and Section 39.14 of Texas Code of Criminal Procedure, and in order to preserve [Finkelberg's] constitutional rights to effective assistance of counsel, right to a fair trial, due process and **due course of law** under the Fifth, Sixth[,] and Fourteenth Amendments to the United States Constitution[;] Article I, Sections 10, 13[,] and 19 of the Texas Constitution[;] and Articles 1.04, 1.05[,] and 1.051 of the Texas Code of Criminal Procedure. In requesting various remedies, [Finkelberg] is not waiving any of the requests. Rather, [Finkelberg] prays the [c]ourt grants this [m]otion, in all things, in addition to any other remedy the [c]ourt finds [Finkelberg] entitled to under the law. [Emphases added in bold.]

The trial court denied the motion without a hearing as none was requested. As

explained below, Finkelberg did not preserve his due course of law complaint.

To preserve a complaint for our review, a party must have presented to the trial

court a timely request, objection, or motion sufficiently stating the specific grounds, if

38

not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1);

*Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). As explained in *Pena*,

> This [r]ule encompasses the concept of "party responsibility." The complaining party bears the responsibility of clearly conveying to the trial judge the particular complaint, including the precise and proper application of the law as well as the underlying rationale. Error preservation does not involve a hyper-technical or formalistic use of words or phrases; instead, "[s]traight[]forward communication in plain English" is sufficient. To avoid forfeiting a complaint on appeal, the party must "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." This gives the trial judge and the opposing party an opportunity to correct the error. Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial. In making this determination, we consider the context in which the complaint was made and the parties' shared understanding at that time.

285 S.W.3d at 463–64 (footnotes omitted).

Just as in *Pena*, the record here shows that Finkelberg did not preserve his due course of law claim for appellate review. On appeal, Finkelberg relies solely on the due course of law clause in the Texas Constitution and argues that it is broader than the due process clause and provides for dismissal of his charges. Although Finkelberg invoked the Texas due course of law provision in his motion to dismiss, he failed to argue that it provides greater protection than the federal due process clause. As noted in *Pena*, Finkelberg (as the complaining party) "was obligated to put the trial judge on notice of the specific legal theory that he intended to advocate because[] the federal constitutional standard was clearly established [and because] there is no independent

39

interpretation on the subject of lost or destroyed evidence under the Texas Constitution's due course of law provision." *Id.* at 464. Following *Pena*, we hold that by failing to distinguish the rights and protections afforded under the Texas due course of law provision from those provided under the Fourteenth Amendment before the trial judge in this context, Finkelberg failed to preserve for appellate review his complaint that the due course of law provision provides greater protection that would allow for the dismissal of his charges.[23] *See id.*

We overrule Finkelberg's fourth issue.

---

[23]Finkelberg's forty-two-page reply brief (which lacks page numbers) details the history of the due process clause and the due course of law clause from the *Magna Carta* forward. Such a verbose recitation of the clauses' history cannot overcome his lack of trial-court preservation.

Moreover, Finkelberg concedes that the Texas Supreme Court has usually treated the Texas due course of law clause as coextensive with the federal due process clause. He cites no case holding that the due course of law provision requires dismissal as a remedy when neither due process nor Article 39.14 would offer that same remedy. Moreover, as pointed out by the State, Finkelberg's suggestion—that an Article 39.14 violation is the very kind of procedural protection that the due course provision is meant to protect—seems contradictory to recent statements by the Texas Court of Criminal Appeals. *See Hallman v. State*, 721 S.W.3d 307, 314, 324 (Tex. Crim. App. 2025) (applying nonconstitutional harm analysis—rather than allowing the dismissal of charges—when State failed to disclose impeachment evidence during the guilt–innocence phase).

## V. Conclusion

Having overruled Finkelberg's four issues, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: January 22, 2026